**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5-07-CV-00174-H(2)**

---

**LILIANA MARTINEZ-HERNANDEZ, et al.,**

**Plaintiffs,**

**v.**

**BUTTERBALL, LLC,**

**Defendant.**

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT ON TWO ISSUES:**

**DONNING AND DOFFING PERSONAL PROTECTIVE EQUIPMENT IS INTEGRAL
AND INDISPENSIBLE TO WORKERS' PRIMARY JOB DUTIES**

**AND**

**DISMISSING BUTTERBALL'S *DE MINIMIS* DEFENSE PRE-JANUARY 2006**

---

**LAW OFFICE OF ROBERT J. WILLIS**
Robert J. Willis
P.O. Box 1269
Raleigh, NC 27602
Tel: (919)821-9031
Fax: (919)821-1763
Email: rwillis@rjwillis-law.com
NC Bar No.: 10730

**GETMAN & SWEENEY, PLLC**
Dan Getman & Matt Dunn
9 Paradies Lane
New Paltz, NY 12561
Tel: (845) 255-9370
Fax: (845) 255-8649
Email: dgetman@getmansweeney.com
Email: mdunn@getmansweeney.com

**TABLE OF CONTENTS**

I. STATEMENT OF THE CASE ................................................................................... 1

II. STATEMENT OF RELEVANT FACTS ............................................................... 1

    Butterball's Production Workers ...................................................................... 1

    Butterball's Required Donning, Doffing and Sanitizing and Waiting Process ........................ 2

    Butterball's PPE Is Integral and Indispensible to Production Workers' Jobs .......................... 4

    Butterball Did Not Pay Production Employees for the Time That It's Expert Measured ......................................................................................................... 12

III. ARGUMENT ..................................................................................................... 13

A. Summary Judgment Standard ....................................................................... 13

B. Fair Labor Standard Act Principles ............................................................. 14

C. PPE is Integral and Indispensable to Work on the Production Floor ....................... 16

    1. Butterball Requires Workers to Wear PPE to Perform Their Job Duties ......................... 20

    2. Workers Wear PPE for Butterball's Benefit .......................................................... 22

    3. The Fact That Some Workers Put On Boots or Bumpcaps Before Arriving Does Not Mean that Other Workers Donning PPE At The Plant Are Not Engaged In A Principal Work Activity. ............................................................................... 26

    4. Butterball Must Pay For All Time Spent Donning PPE From The First Principal Work Activity, Notwithstanding Whether the PPE Is Deemed Unique or Non-Unique ...................................................................................... 29

D. Butterball's De Minimis Defense Pre-December 2005 Is Without Merit ................. 32

    1. Taking Butterball's Expert's Testimony As Correct, Butterball Recorded The Uncompensated Time .......................................................................... 35

    2. According to Butterball's Expert, The Amount of Unpaid Compensable Time Is Substantial ...................................................................................... 37

    3. Butterball Requires Uncompensated Work On A Daily Basis .......................... 39

IV. CONCLUSION ................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*A.H. Phillips v. Walling*, 324 U.S. 490 (1945) ............................................................... 15

*Addison v. Huron Stevedoring Corp.*, 204 F.2d 88 (2d Cir. 1953) ............................... 38

*Aiken v. City of Memphis*, 190 F.3d 753 (6th Cir.1999) ............................................... 35

*Alvarez v. IBP, Inc.*, 399 F.3d 894 (9th Cir. 2003) ....................................................... 20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 14, 16

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ................................... 16, 32

*Anderson v. Perdue Farms, Inc.*, 604 F.Supp.2d 1339 (M.D.Ala. 2009) ............... 20, 28

*Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388 (1960) ...................................................... 15

*Atlantic Co. v. Broughton*, 146 F.2d 480 (5th Cir.1944) .............................................. 34

*Auer v. Robbins*, 519 U.S. 452 (1997) .......................................................................... 28

*Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901 (9th Cir. 2004) ............................... 26

*Barrentine v. Arkansas-Best Freight System, Inc., et al.*, 450 U.S. 728 (1981) ........... 14

*Brock v. City of Cincinnati*, 236 F.3d 793 (6th Cir.2001) ............................................ 35

*Brock v. Richardson*, 812 F.2d 121 (3d Cir.1987) ........................................................ 15

*Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130 (3d Cir. 1999) .................................. 34

*Calderon v. Witvoet*, 999 F.2d 1101 (7th Cir.1993) ..................................................... 34

*Celotex v. Catrett*, 477 U.S. 317 (1986) ................................................................. 14, 16

*Clark v. Wells Fargo Financial, Inc.*, 2008 WL 4787444 (M.D.N.C. Oct. 30 2008) .................. 33

*Collins v. Sanderson Farms, Inc.*, 568 F. Supp.2d 714 (E.D. La. 2008) ...................... 39

*De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361 (3d Cir. 2007) .................................... 31

*Drayton v. Pilgrim's Pride Corp.*, 472 F.Supp.2d 638 (E.D.Pa. 2006) ........................ 24

ii

*Fox v. Tyson Foods, Inc.*, No. 99CV01612, 2002 WL 32987224 (N.D.Ala. Feb. 4, 2002) ........................................................................................................... 32

*Franklin v. Kellogg Co.*, ---F.3d ----, 2010 WL 3396843 (6th Cir. 2010).................................... 24

*Garcia v. Frog Island Seafood, Inc.*, 644 F.Supp.2d 696 (E.D.N.C. 2009) .................................... 14

*Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240 (D.Kan.2007) ................................................. 31

*Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C. 1986).................................................................. 15

*Helmert v. Butterball, LLC*, No. 4:08CV00342 JLH, 2009 WL 5066759 (E.D.Ark. Dec. 15, 2009)............................................................................................... 25, 33

*Hosler v. Smithfield Packing Co.*, Case No. 7:07-CV-166-H (E.D.N.C. M&R filed August 31, 2010).......................................................................................... 20

*Hosler v. Smithfield Packing Co., Inc.*, 7:07-CV-166-H, Doc. 442 (E.D.N.C. Sept. 27, 2010) ................................................................................................... 16, 31

*Hoyt v. Ellsworth Cooperative Creamery*, 07-CV-386-JCS, 2008 WL 3828583 (W.D.Wisc. 2008) ................................................................................... 21

*IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005).................................................................. 16, 18, 19, 28

*Johnson v. Koch Foods, Inc.*, 670 F.Supp.2d 657 (E.D.Tenn. 2009) ........................................... 32

*Jordan v. IBP, Inc.*, 542 F.Supp.2d 790 (MD.Tenn. 2008) .............................................. 25, 27, 31

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 954 (W.D.Wis.2008)............................................................................................. 37, 39

*Kelley v. Alamo*, 964 F.2d 747 (8th Cir.1992) ............................................................................ 15

*Landaas v. Canister Co.*, 188 F.2d 768 (3d Cir.1951).................................................................. 38

*Lee v. Am-Pro Protective Agency, Inc.*, 860 F.Supp. 325 (E.D.Va. 1994) .................................... 32

*Lindow v. U.S.*, 738 F.2d 1057 (9th Cir.1984)........................................................... 35, 37, 38, 40

*Lopez v. Tyson Foods*, No. 8:06CV459, 2007 WL 1291101 (D.Neb. March 20, 2007) .......................................................................................................... 32

*McDonald v. Kellogg Co.*, --- F.Supp.2d ---, 2010 WL 3724649 (D.Kan. Sept. 16, 2010) .......................................................................................................... 33

iii

*Mitchell v. King Packing Co.*, 350 U.S. 260 (1956) ...................................................................... 32

*Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207 (1959).................................................... 15

*Parker v. Smithfield Packing Co.*, Case No. 7:07-CV-176-H, Doc. 281 (E.D.N.C. M&R filed August 31, 2010) ..................................................................... 20

*Parker v. Smithfield*, 7:07-cv-00176-BO, Doc. 234 (E.D.N.C. Jan. 15, 2010)............................ 33

*Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499 (D.Md. 2009)...................................... passim

*Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir. 1998) ................................................................ 38

*Rogers v. City of Troy, N.Y.,* 148 F.3d 52 (2d Cir. 1998) ............................................................. 34

*Saunders v. John Morrell & Co.,* No. C88-4143, 1992 WL 531674 (N.D.Iowa Oct. 14, 1992)..................................................................... 37, 39

*Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860 (W.D.Wis.2007)............................ 32, 39

*Steiner v. Mitchell*  350 U.S. 247 (U.S. 1956) ...................................................................... passim

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944) .......... 16, 21, 27

*Thrower v. Peach County, Georgia, Bd. Of Educ.*, 5:08-CV-176 (MTT), 2010 WL 4536997 (M.D.Ga. Nov. 2, 2010) ..................................................................... 40

*U.S. v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir.1960) ......................................... 34

**Statutes**

21 U.S.C. § 461 ..................................................................... 23

29 U.S.C. § 254..................................................................... 16, 18, 30

29 U.S.C. § 662 ..................................................................... 23

29 U.S.C. §207..................................................................... 15

29 U.SC. § 666 ..................................................................... 23

29 USC § 653..................................................................... 25

NCWHA § 95-25.22 ..................................................................... 34

iv

NCWHA § 95-25.6 ................................................................................................................... 34

**Other Authorities**

Wage and Hour Advisory Memorandum No. 2006-2 (May 31, 2006)................................... 22, 31

Wage and Hour Division Opinion Letter, U.S. DOL, 2001 WL 58864 (Jan 15, 2001) ................................................................................................................................... 21

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................... 14, 16

**Regulations**

21 C.F.R. § 110.10 ........................................................................................................... 5, 24, 25

29 C.F.R. § 778.106 ............................................................................................................... 34

29 C.F.R. § 785.47 ................................................................................................................. 37

29 C.F.R. § 790.6 ............................................................................................................... 17, 28

29 C.F.R. § 790.8 ................................................................................................... 15, 18, 19, 21

9 C.F.R. § 416.12 ............................................................................................................. 5, 24, 25

9 C.F.R. § 416.5 ..................................................................................................................... 24

9 C.F.R. § 430.4 ..................................................................................................................... 24

9 C.F.R. § 500.2 ................................................................................................................. 23, 24

v

# I.   STATEMENT OF THE CASE

This case concerns the way Butterball pays its production line employees at its Duplin County processing plant. Butterball does not pay production line employees based on their actual time. Butterball usually ignores the actual work time for this particular class of workers. Instead, Butterball pays line employees for their scheduled time on the line - time Butterball calls "GANG" time, rather than paying for the actual time worked. Then Butterball automatically deducts either 30 or 60 minutes to account for breaks.

Butterball has clear policies which it uses to reduce plaintiffs' pay across the entire class of employees. These policies are written and are implemented across the board. Thus, regardless of the actual time spent on donning, doffing, and sanitizing required personal protective equipment pre and post shift and during break, Butterball refuses to pay workers for all the time they have worked.

The FLSA was designed to prevent employers from shorting employees by manipulating what hours are treated as "work." The North Carolina Wage and Hour Act ("NCWHA) law has similar protections. Plaintiffs bring this case to collect the entire amount of back pay due to class of Butterball line employees who were not paid for their actual time working.

# II.   STATEMENT OF RELEVANT FACTS

**Butterball's Production Workers**

1. Butterball is one of the largest turkey processors in the world. Ex. 1, Butterball, LLC, Corporate Information website; Ex. 2, Butterball's website, Butterball, LLC, Corporate Information, International website.

2. The Duplin County North Carolina plant is Butterball's largest turkey processing plant. Ex. 3, Employee Handbook, p.3.

3. It employs approximately 2,200 production workers. See, Ex. 4, Sanderson Dep., p. 72:19-23; Ex. 5, Fernandez Report, p. 29.

4. Butterball's production workers are responsible for preparing and processing Butterball's turkey products. *See, e.g.*, Ex. 6, Aponte Dep., 15:10-11; Ex. 7, Martinez-Hernadez Dep., p. 10:8-16; Ex. 8, Barnes Dep., p.10:1-3 (job is to hang birds).

5. They work in one of two parts of the plant processing various turkey products. *See*, Ex. 9, Brinson, Sandra Dep., p. 26:11-14; Doc. 455, p. 5, ¶11 and 15.

6. Although workers perform a variety of tasks and work in different areas, they must all put on personal protective equipment (PPE) before they enter the production area. Ex. 8, Barnes Dep., pp.31:16-33:4; Ex. 5, Fernandez Report, p. 20, Table 12.

7. They are paid an hourly wage for the time the production line runs. Ex. 10, Butterball 30(b)(6) Dep., March 25, 2008, p. 82:5-13; Ex. 11, Ingram Dep. p. 15:6-:9; Doc. 455, p.3, ¶ 2; Ex. 12, Notice.

**Butterball's Required Donning, Doffing and Sanitizing and Waiting Process**

8. Butterball requires workers to arrive at the plant before the start of their shift. See e.g., Ex. 7, Martinez-Hernandez Depo., 12:12-22; Ex. 13, Plaintiffs' Punch Detail.

9. They must arrive early enough so that they can engage in mandatory and thorough sanitization and food safety regimen in order to be physically on the production floor at their scheduled start time.

10. Before entering the production floor, workers clock into the Kronos time system with their Butterball issued personal ID card. Workers follow mandatory procedures to don PPE, sanitize

2

themselves and their boots. They must also deposit personal items in their locker to avoid food contamination and they immediately start donning their approved personal protective equipment ("PPE"). See e.g., Ex. 6, Aponte Depo., 70:5-73:3; Ex. 7, Martinez-Hernandez Depo., 42:19-43:2.

11. Butterball supplies lockers and a changing area to workers to store PPE when they are out of the plant, and to store their personal items which cannot be brought into the production area when they are working.

12. Throughout the workday, workers receive two thirty minute unpaid periods. Ex. 14, Time Calculation Rules.

13. Butterball trains workers that the thirty minute breaks run from the time workers leave the production line, to when they must be back on the line to resume work.

14. Butterball does not record the actual time workers spend on break or the actual time workers are free on break from all donning, doffing, or other compensable work.. See e.g., Ex. 13, Plaintiffs' Punch Detail; Doc. 455, p. 7, ¶18.

15. During the two brief breaks, workers are required to remove and store - "doff - their PPE. Ex. 6, Aponte Dep., 93:23-100:9; Ex. 7, Martinez-Hernandez Dep., 66:7-67:3.

16. After doffing their PPE, employees are allowed to use the bathroom, smoke a cigarette, or eat. Ex. 6, Aponte Dep., 100:16-24; Ex. 7, Martinez-Hernandez Dep., 65:4-21.

17. Before they return to the production line, Plaintiffs are required to once again don their PPE. Ex. 6, Aponte Dep., 100:1:15; Ex. 7, Martinez-Hernandez Dep., 66:21-24.

18. If they arrive late to the production line then they can be disciplined. Ex. 7, Martinez-Hernandez

3

Dep., 67:17-68:7.

19. Finally, at the end of the shift - when the production line stops- workers clean and take off all
their PPE for the last time. Ex. 16, Second Aponte Decl., PX 10-1; Ex. 7, Martinez-Hernandez
Dep., 54:16-55:4.

20. They deposit the disposable PPE in the trash and return some PPE to Butterball for sanitizing.
Ex. 6, Aponte Dep., 94:21-95:13; Ex. 7, Martinez-Hernandez Dep., 56:9-57:12.

21. They also are required to clean some of the PPE, such as their boots. Ex. 6, Aponte Dep.,
136:16-17; Ex. 16, Second Aponte Decl.; Ex. 10, Butterball 30(b)(6) Dep., March 25, 2008, p.
187:7-188:8, 189:4-10.

22. They dispose of some of the PPE, place some PPE in bins to be washed. Ex. 17, Butterball
30(b)(6) Dep., Jan. 13, 2010, p. 173:7-13.

23. Workers place their PPE in their lockers to store for their next shift. See e.g., Ex. 18, Gibbs
Dep., p. 84:7-11; Ex. 19, Hill Dep., p. 36:10-21; Ex. 20, Grady Dep., p. 63; Ex. 21, Joyner Dep.,
p. 32.

24. They also retrieve their personal items from their lockers and clock out. The process begins
anew with the next shift. Ex. 6, Aponte Dep., pp. 75:24-78; Ex. 10, Butterball 30(b)(6) Dep.,
March 25, 2008, p. 109:3-9.

**Butterball's PPE Is Integral and Indispensible to Production Workers' Jobs**

25. Workers must wear an array of PPE in order to perform their job duties. Ex. 10, Butterball
30(b)(6) Dep., March 25, 2008, pp. 89:23-90:6; Ex. 22, PPE List.

26. This PPE includes boots, earplugs, hairnets and beard nets, bump caps, plastic sleeves, cotton

4

gloves, plastic gloves, smocks, and aprons. Ex. 23, PPE List; Ex. 5, Fernandez Report, p. 20, Table 12; Ex. 22, PPE List.

27. For purposes of this litigation, Butterball labels boots, hair nets, ear plugs, smock, gloves, bump caps, safety glasses as non-unique gear. Ex. 24, Butterball 30(b)(6) Dep. Jan. 14, 2010, p. 143:11-12.

28. Workers who use a knife or scissors must also wear an arm guard, Kevlar glove, and steel mesh glove. Ex. 11, Ingram Dep. pp. 147:13-148:22, 154:15-156:19.

29. Other workers wear coveralls and freezer jackets. Ex. 11, Ingram Dep. pp. 152:24-153:8.

30. Some workers put on duct tape and paper towels to perform their job duties. *See* Ex. 25, Videotape of Live Hang Department

31. Workers wear different PPE depending of their job duties. Ex. 15, "What does HACCP, GMP's, SSOP's, and SPS's stand for?; Ex. 26, Good Manufacturing Practices (GMP's); Exs. 22 and 23, PPE Lists.

32. Workers have to wear PPE in order to prevent food contamination. Ex. 15, "What does HACCP, GMP's, SSOP's, and SPS's stand for?; Ex. 26, Good Manufacturing Practices (GMP's); Ex. 30, Moore Dep. p. 89:9-14; Ex. 28, Brinson, S. Dep., pp. 40:8-41:11 (Senior Human Resources Representative, Brinson Dep., p. 6:11-13); Ex. 29, Swan Dep. pp. 119:23-120:20; Ex. 31, Lenaghan Dep. July 26, 2010, p. 91:4-16; Ex. 3, Employee Handbook at BB 00437-438.

33. The Food and Drug Administration and U.S. Department of Agriculture regulate the turkey industry in order to prevent adulterated food. 21 C.F.R. § 110.10; 9 C.F.R. § 416.12. Butterball

5

has implemented "Good Management Practices" or "GMPs" to prevent food contamination.

Ex. 15, "What does HACCP, GMP's, SSOP's, and SPS's stand for?; Ex. 26, Good

Manufacturing Practices (GMP's).

34. GMPs are policies, procedures and practices to prevent food contamination. Ex. 15, "What does

HACCP, GMP's, SSOP's, and SPS's stand for?"; Ex. 26, Good Manufacturing Practices

(GMP's).

35. The turkey industry is susceptible to contamination from Listeria monocytogenes among other

possible contaminants. 9 C.F.R. § 430.4. Listeria monocytogenes can cause death. 9 C.F.R. §

430.4; Ex. 27, Listeriosis description by the Center for Disease Control and Prevention.

36. Butterball has established written GMPs that it distributes to its workers. Butterball explains

that:

Good Manufacturing Practices are codes of practice designed to reduce the chance of
problems which could adversely affect a manufactured product. The quality of the product
produced is directly related to the environment in which it is produced and the hygiene of
the people who handle the product and people who tour the processing plant. Butterball,
LLC (Mount Olive has a GMP policy, which includes disease control and cleanliness." Ex.
15, "What does HACCP, GMP's, SSOP's, and SPS's stand for?".

37. Butterball's GMPs state:

Hygienic practices are necessary to protect against contamination of food on the food, food
contact surfaces and food-packaging materials. Thus employees are required to "wear an
approved smock" and employees "working with exposed meat must wear approved plastic
sleeves, apron and gloves over any non-plastic arm and hand coverings (e.g. cotton gloves).
Ex. 26, Good Manufacturing Practices (GMP's)

38. Butterball recognizes the severe consequences of the failure to provide its customers with

bacteria free products. For example, Butterball explains to its workers that people may become

ill or die, and may cause the USDA to close Butterball's plant. Ex. 3, Employee Handbook at

6

BB 00436 (The Butterball, LLC HACCP Program); 9 C.F.R. § 500.2.

39. Butterball mandates that workers comply with its GMPs and wear PPE to comply with Butterball's obligations under federal law and to supply its customers with food products free of contamination. Ex. 15, "What does HACCP, GMP's, SSOP's, and SPS's stand for?"; Ex. 26, Good Manufacturing Practices (GMP's); Ex. 28, Brinson, S. Dep., pp. 40:8-41:11; Ex. 29, Swan Dep. pp. 119:23-120:20 (Complex Manager, p. 10:12-10:18).

40. **Hair and Beard Nets:** Butterball requires workers to wear hair nets and beard nets to prevent food contamination from hair. Hairnets and beard nets must completely cover all hair. Ex. 32 , Employee Orientation Slideshow at BB 011882-3, 0011891; Ex. 26, Good Manufacturing Practices (GMP's); Ex. 11, Ingram Dep, pp. 148:23-149:6.

41. **Water Resistant Shoes and Boots:** Butterball requires Plaintiffs to wear this PPE because footwear can be a source of transporting contamination. Ex. 26, Good Manufacturing Practices (GMP's); Ex. 32, Employee Orientation Slideshow at BB 011882-3, 0011891; Ex. 33, at BB 00394, PPE Procedure Footwear ("All footwear will meet OSHA Regulations 29 CFR 1910.132 and 29 CFR 1910.136 as well as the requirements for food safety." Butterball prohibits canvas or suede-like boot or shoe materials because the "limited ability to clean those materials."). Butterball's policy requires boots to be taken off and put on at the facility. Ex. 33, at BB 00395, PPE Procedure Footwear; Butterball 30(b)(6) Jan. 13, 2009, pp. 40:20-41:4. Further, workers on the RTE side of the plant cannot take the boots into the break area or cafeteria. Butterball 30(b)(6) Dep. July 28, 2010 p. 14:20-23. And they cannot the boots home. Ex. 76, Lerch Dep., pp. 24:22-25:10. These strict standard is to prevent food contamination. Ex.

7

32, Employee Orientation Slideshow at BB 011883; Ex. 3, Employee Handbook at BB 00435.

42. **Smocks:** Butterball requires this PPE to prevent both contamination and foreign objects from getting into Butterball's product. Ex. 32, Employee Orientation Slideshow at BB 011891. This PPE is not allowed in the locker room area, outside of the plant, restrooms, or the cafeteria. Ex. 32, Employee Orientation Slideshow at BB 011881; Ex. 17, Butterball 30(b)(6) Jan. 13, 2010 Dep., pp. 171:18-172:11. They are required by USDA regulations. Ex. 17, Butterball 30(b)(6) Jan. 13, 2010 Dep., p. 167:10-15.

43. **Arm Guards:** Butterball requires workers to wear this PPE to prevent both contamination and foreign objects from getting into Butterball's product. Ex. 32, Employee Orientation Slideshow at BB 011891; Ex. 11, Ingram Dep. p. 148:14-22. This PPE is also necessary to prevent injuries to workers and thus slowing down production and increasing labor and workers' compensation costs. Ex. 11, Ingram Dep., pp. 147:9-148:22.

44. **Bump Caps / Hard Hats:** Butterball requires some workers to wear this PPE in order to identify workers in different positions and different departments. This PPE comes in different colors and have different markings on them. Ex 34, Bump Cap Hard Cap Procedure at BB 00393. These marking and colors identify whether a worker is a trainee, supervisor, or trainer. Ex. 11, Ingram Dep. pp. 149:7-151:10. Bump caps are also needed to prevent food contamination. Ex. 32, Employee Orientation Slideshow at BB 011891; Ex 34, Bump Cap Hard Cap Procedure at BB 00392. They are also need to prevent injuries to workers thus slowing down production and increasing labor and workers' compensation costs. Ex. 11, Ingram Dep. p. 151:2-9.

8

45. **Plastic or Vinyl Sleeves**: Butterball requires these items of PPE to both avoid biological contamination and foreign objects from getting into Butterball's product. Ex. 32, Employee Orientation Slideshow at BB 011891. Some workers wear blue plastic sleeves. They are required by the USDA. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009 Dep. p. 167:10-15. Workers are prohibited from taking them into the restroom. Ex. 17, Butterball 30(b)(6) Jan 13, 2009 Dep., p. 244:10-13.

46. **Vinyl and Rubber Gloves**: Butterball requires these items of PPE to prevent both contamination and foreign objects from getting into Butterball's product. Ex. 32, Employee Orientation Slideshow at BB 011891; Ex. 17, Butterball 30(b)(6) Jan. 13, 2009 Dep. pp. 153:17-154:9. They are needed to prevent Blood Borne Pathogens. Ex. 35, Presentation on Blood Borne Pathogens, pp. 3-4. They are not allowed in the locker room area, outside of the plant, restrooms, or the cafeteria. Ex. 10, Butterball 30(b)(6) Dep., March 25, 2008, p. 209:5-11; Ex. 17, Butterball 30(b)(6) Jan. 13, 2009, pp. 171:18-172:11.

47. **Ear Protection**: Butterball requires these items of PPE to prevent hearing loss. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009, p. 151:9-18. Workers are not allowed on the production floor without ear plugs or other ear protection. Ex. 10, Butterball 30(b)(6) Dep., March 25, 2008, p. 144:11-17. Employees injured from hearing loss slow down production and increasing labor and workers' compensation costs. Ex. 36, Dejesus Dep., pp. 107:6-108:6.

48. **Aprons**: Butterball requires these items of PPE to prevent both contamination and foreign objects from getting into our product." Ex. 32, Employee Orientation Slideshow at 011891; Ex. 30, Moore Dep, p. 139:4-140:7. They are not allowed in the locker room area, outside of the

plant, restrooms, or the cafeteria. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009, pp. 171:18-172:11.

They are required by USDA regulations. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009, p. 167:10-15

49. **Cut Resistant Gloves (Steel/Kevlar/Metal Mesh)**: To prevent contamination of turkey

products Butterball prohibits these items from entering the locker room area, outside of the

plant, restrooms, or the cafeteria. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009, 171:18-172:11.

50. **Cotton Gloves**: Butterball requires these items of PPE for food safety. Ex. 37, Sill Dep., p.

118:19-20. They are needed to keep employees hands warm in the cold plant. Ex. 10, Ingram

Dep., p. 151:24-152:18. They also protect hands against cuts. Ex. 38, PPE-Hand Protection at

BB 00406-7.

51. **Safety Glasses / Eye protection**: Butterball requires these items of PPE to prevent contact with

foreign material and splashing of processing water and thus reduce contamination. Ex. 39, PPE

– Eye Protection at BB 00403; Ex. 32, Employee Orientation Slideshow at BB 011891. It is

also required to prevent injury to workers' eyes. An eye injury could require Butterball to hire

another worker and slow down production. Ex. 36, Dejesus Dep., pp. 107:6-108:6. They are

needed to prevent Blood Borne Pathogens. Ex. 35, Presentation on Blood Borne Pathogens at

p.3.

52. **Coveralls**: Butterball requires these items of PPE. Workers wear coveralls to prevent rashes.

Dejesus Dep., p. 27:4- 28:16.

53. **Freezer coats**: Butterball prohibits these items from being worn outside. And they must be

"hung on hooks, inside of distribution break areas, while eating lung or during break." BB

00438

10

54. Workers in RTE are required to tie a colored ribbon on to their PPE to the line that they work on. Ex. 76, Lerch Dep., pp. 47:10-48:13.

55. Live hang workers wear cotton gloves to prevent callusing on their hands and injuries from the claws of live birds. Ex. 36, Dejesus Dep., pp. 36:9-38:19.

56. Live Hang Department workers wrap their hands and sleeves with duct tape. This is to prevent hand injuries from hanging live thrashing birds. It is also to prevent rashes from feces, dust, and feathers from sliding down their sleeves or coming in contact with their skin. Ex. 36, Dejesus Dep., pp. 36:9-38:19.

57. Workers understand that they must wear PPE. Plaintiffs testified that Butterball requires them to wear PPE. *See e.g.*, Ex. 8, Barnes Dep. pp. 31:16-33:9; Ex. 40, Boney Dep., pp. 16:22-17:14, 23:13-25:9; Ex. 9, Brinson, P., Dep. p. 47:2-12; Ex. 41, Butler Dep., p. 21:19-25:4; Ex. 42, Canongo Dep., pp. 38:19-39:22; Ex. 43, Chestnut Dep., p. 25:14-21; Ex. 44, Cummings Dep., p. 28:2-20, 34:20-35:2; Ex. 45, Gibbs Dep., pp. 79:20-84:3; Ex. 46, Hill Dep., pp. 31:16-33:14; Ex. 47, Hodges Dep. p. 31:4-31:12; Ex. 48, Houston Dep., pp. 23:5-24:20, 25:18-20; Ex. 49, McCoy Dep., pp. 26:11 to 29:17; Ex. 50, Batts-Miller Dep., pp. 56:24-58:6; Ex. 51, Morris, Erica D., (Pages 33:3 to 38:13); Ex. 52, Peacock Dep., p. 60-64; Ex. 53, Cobb Dep., pp. 63-64; Ex. 54, Graham Dep., pp 26, 38; Ex. 55, Hernandez-Flores Dep. p. 26; Ex. 56, James Dep., pp. 34-35; Ex. 57, Joyner Dep., p. 33; Ex. 58, Leonard Dep., p. 34; Ex. 59, Moore Dep., pp. 28-33; Ex. 60, Rodriguez-Santiago Dep., p. 67; Ex. 61, Suggs-Meyer Dep., pp. 39:21-41:15; Ex. 62, Thompson Dep., pp. 55-57; Ex. 63, Vega-Castro Dep., p. 34; Ex. 64, Wells Dep., pp. 21-22; Ex. 65, Williams, Annie Dep., pp. 44-45; Ex. 66, Williams, Antonio Dep., p. 21; Ex. 67,

11

Wilson Dep., pp. 30-34; Ex. 68, Zambrano Dep., p. 40; Ex. 69, Salinas Dep., pp. 27:24-30:3; Ex. 70, Swinson, Sayda Suyapa, pp. 23:12-26:22.

58. Defendant's supervisors testified that Butterball requires production workers to wear PPE. *See e.g.* Ex. 71, Armwood Dep. pp. 39:29-40:16, 65:2-4 (supervisor on the raw side Armwood Dep., p. 8:6-9); Ex. 28, Brinson, S. Dep., pp. 40:8-41:11; Ex. 72, Sarmiento Dep., 24:12-25:8, 26:23-28:10 (Tray Pack Evening Supervisor, p. 12:3-5).

59. All workers must sign Butterball's forms acknowledging their obligation to comply with the Food Safety & Personal Hygiene Policy. Ex. 3, Employee Handbook at BB 00443.

60. If a worker fails to wear the required items of PPE, Butterball will not allow them on the production floor. Cummings Dep., p. 28:2-6; Batts-Miller Dep., pp. 182:2-183:1.

61. Butterball's Quality control employees monitor the production floor entrance to ensure workers wear their mandatory PPE. Ex. 44, Cummings Dep., p. 28:2-6, 58:2-24; Ex. 50, Batts-Miller Dep., pp. 182:2-183:1.

62. If a worker fails to wear PPE the worker is subject to discipline. Ex. 17, Butterball 30(b)(6) Jan. 13, 2009 pp. 244:22-245:2. This discipline can result in termination. Ex. 3, Employee Handbook at BB 00443 (Food Safety & Personal Hygiene Policy); Ex. 17, Butterball 30(b)(6) Jan. 13, 2009 Dep., p. 245:3-10.

63. Some PPE also protects Butterball from worker's compensation claim by reducing injuries on the job. Ex. 36, Dejesus Dep., pp. 107:6-108:6.

64. If a worker is injured, Butterball's production is reduced. Ex. 36, Dejesus Dep., pp. 107:6-108:6.

12

65. Butterball requires workers to wear PPE to reduce employee turnover. Ex. 29, Swan Dep. p. 119:5-22.

**Butterball Did Not Pay Production Employees for the Time That It's Expert Measured**.

66. On June 21, 2006, Butterball only paid production employees who were still employed retroactive "plug time" of six minutes per day to partially compensate them for unpaid work under *IBP v. Alvarez* going back to January 1, 2006. Doc. 455, p. 13, ¶ 45.

67. Butterball's expert Dr. Fernandez measured discrete pre and post shift activities, including donning, doffing, and sanitizing PPE and walking to various locations within Butterball's facility. Fernandez Report. Dr. Fernandez measured those discrete activities for 13 areas. Those total measurements are contained in Exhibit 5. Ex 5, Fernandez Report, pp. 49-61.

68. Butterball's expert calculated that workers spent 8.602 to 25.013 minutes (depending on the area in which they worked) performing discrete donning, doffing, walking, and sanitizing activities at the beginning and end of each shift and on breaks. Ex 5, Fernandez Report, pp. 49-61.

69. Prior to June 5, 2006 Butterball's Notice states that Butterball paid production workers a minimum of $7.40 per hour. Ex. 12, Notice.

70. Prior to June 5, 2006, Butterball's Notice states that Butterball paid live hang workers a minimum of $9.90 per hour. Ex. 12, Notice

71. Butterball could place time clocks in a position to measure the first principal work activity and the last. Ex. 73, Butterball 30(b)(6) Dep., Dec. 15, 2009, p.18:22-19:17, p. 30:8-31:9; Ex. 74, Dr. Fernandez Dep., pp. 127:9-129:3, 131:11-131:21.

13

### III. ARGUMENT

**A. Summary Judgment Standard**

The Federal Rules of Civil Procedure encourage the use of summary judgment to narrow issues for trial and eliminate matters that do not involve genuine issues of material fact. *Celotex v. Catrett*, 477 U.S. 317, 327 (1986). "Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, but must come forward with specific facts showing that there is a genuine issue for trial." *Garcia v. Frog Island Seafood, Inc.*, 644 F.Supp.2d 696, 703-04 (E.D.N.C. 2009) (citation and quotations omitted). The Rules provide that a party may move for summary judgment on any part of a claim or counter claim, with or without affidavits. Fed. R. Civ. P. 56(a). The Court may render summary judgment on liability even where genuine issues with respect to the amount of damages remain. Fed. R. Civ. P. 56(c). A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Id*.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

**B. Fair Labor Standard Act Principles**

"The principle congressional purpose in enacting the FLSA was to protect all covered workers from substandard wages and oppressive working hours. . . . [and to ensure that employees] would be protected from the evil of 'overwork' as well as 'underpay.'" *Barrentine v. Arkansas-Best Freight System, Inc., et al.*, 450 U.S. 728, 739 (1981) (citations omitted). To protect against excessive hours of work, the statute requires that employers pay employees for hours in excess of 40 in a week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.

14

§207(a)(1).

The FLSA was designed "'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' ... Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. " *A.H. Phillips v. Walling,* 324 U.S. 490, 493 (1945); *Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388, 392 (1960). Conversely, the FLSA is construed broadly in favor of employees. *Brock v. Richardson*, 812 F.2d 121, 123 (3d Cir.1987) ("The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted."); *Kelley v. Alamo*, 964 F.2d 747, 749-50 (8th Cir.1992); *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959); *Haywood v. Barnes*, 109 F.R.D. 568, 586 (E.D.N.C. 1986). With respect to the specific issue in this case, *see also* 29 C.F.R. § 790.8 "The legislative history further indicates that Congress intended the words ''principal activities'' to be construed liberally in the light of the foregoing principles to include any work of consequence performed for an employer, no matter when the work is performed". The Supreme Court has been required on multiple occasions to strongly enforce the FLSA against claims by employers that they need not pay for all hours expended by employees on the employer's behalf.

> these provisions, like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner. Accordingly we view Sections 7(a), 3(g) and 3(j) of the Act as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employment. To hold that an employer may validly compensate his employees for only a fraction of the time consumed in actual labor would be inconsistent

15

with the very purpose and structure of those sections of the Act.

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597-598, (1944)(travel down mine shafts though not "productive" is compensable work).

.To avoid summary judgment, Butterball must proffer evidence sufficient to create a "genuine issue of material fact" that Butterball's workers are plainly and unmistakably paid in conformity with the Act. Fed.R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson*, 477 U.S. 242 (1986). This it cannot do.

## C. PPE is Integral and Indispensable to Work on the Production Floor

Workers must be paid for all of the time between the first and last principal work activities, including time spent donning and doffing, sanitizing, and traveling within Butterball's poultry plant under the "continuous work day" rule. *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005); *Hosler v. Smithfield Packing Co., Inc.*, 7:07-CV-166-H, Doc. 442, p. 3 (E.D.N.C. Sept. 27, 2010).

The history behind this is worth noting. The history begins with the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691-692, (1946), where the Court held that:

> time spent in walking to work on the employer's premises, after the time clocks were punched, involved 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' . . . Work of that character must be included in the statutory workweek and compensated accordingly, regardless of contrary custom or contract.

*Id.* The next year, Congress legislatively overruled this aspect of the *Anderson* decision in enacting the Portal to Portal Act.

Under the Portal to Portal Act, 29 U.S.C. § 254, Congress mandated the following exceptions to compensable work:

(a) Activities not compensable

16

Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . .

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

Shortly after Congress passed the Portal-to-Portal Act, the Department of Labor promulgated a regulation defining "work-day" as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F .R. § 790.6(a), (b). Therefore, "to the extent that activities engaged in by an employee occurs after the employee commences to perform the first principal activity on a particular workday and before he ceases the performance of the last principal activity on a particular workday," those activities are not excluded from FLSA coverage by the Portal-to-Portal Act. *Id.*

The Supreme Court next revisited these issues in *Steiner v. Mitchell,* 350 U.S. 247 (1956), and held that changing clothes and showering at a battery plant were compensable activities under the FLSA and Portal to Portal Act. "[T]he term 'principal activity or activities' in Section 4 [of the Portal-to-Portal Act] embraces all activities which are an 'integral and indispensable part of the principal activities,' and that the activities in question fall within this category." *Steiner,* 350 U.S. at 252-253. Thus, under *Steiner*, activities, such as the donning and doffing of specialized protective gear, that are "performed either before or after the regular work shift, on or off the production line,

17

are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *Id.*, at 256, 76 S.Ct. 330. The Court held that the changing of clothes and showering at issue there were principal work activities noting that the Company "required" these activities in accordance with state law. *Id.,* 350 U.S. at 248 and 251.

The Supreme Court reiterated its holding in *Steiner* when it next dealt with continuous work day rule in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005). As the Supreme Court stated in *Alvarez* "Other than its express exceptions for travel to and from the location of the employee's 'principal activity,' and for activities that are preliminary or postliminary to that principal activity, the Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the terms 'work' and 'workweek,' or to define the term 'workday'." *Id.,* 546 U.S. at 28. Thus, if any activities are integral and indispensable to the first principal work activity then they too are compensable and begin the continuous work day. *Id.*.[1] The key event to determine the start of the workday is what is the first principal work activity, including the first associated integral and indispensable activity that relates to it. 29 C.F.R. § 790.8(b). Further, consistent with the underlying principles for interpreting the FLSA, Congress meant the term activities to be construed broadly. 29 C.F.R. § 790.8(a).

This case presents the question of what is the first and last principal work activities.[2] *Steiner v.*

_____

[1] Even though the Portal to Portal Act amended the FLSA and does not require employers to pay for time that is preliminary or postliminary to employees' first principal work activity, the term "principal activity" is to be construed broadly. 29 C.F.R. § 790.8; *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005); 29 U.S.C. § 254(a).
[2] "As noted above, in Steiner, we made it clear that § 4 of the Portal-to-Portal Act does not remove activities which are " 'integral and indispensable' " to " 'principal activities' " from

18

*Mitchell* 350 U.S. 247, 254 (U.S. 1956), looked to two points to determine if changing clothes and showering are principal work activities under the Portal to Portal Act, 1) whether the activities are "integral" to the job and 2) whether they are "indispensable" to the job. "[T]he Senate intended the activities of changing clothes and showering to be within the protection of the Act if they are an integral part of and are essential to the principal activities of the employees." *Steiner v. Mitchell* 350 U.S. 247, 254, 76 S.Ct. 330, 334 (U.S. 1956). *IBP v. Alvarez,* reaffirmed the *Steiner* test for those activities "integral and indispensable" to a principal work activity. *Alvarez,* 546 U.S. at 33-4. "Accepting the necessary import of our holding in *Steiner,* we conclude that the locker rooms where the special safety gear is donned and doffed are the relevant "place of performance" of the principal activity that the employee was employed to perform within the meaning of § 4(a)(1)." *Id.,* at 34. As the Department of Labor's regulation states:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes,[65]
>
> > fn65 Such a situation may exist where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work.
>
> changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a ''preliminary'' or ''postliminary'' activity rather than a principal part of the activity."

29 C.F.R. § 790.8(c)(some footnotes omitted).

Here there can be no doubt that donning the PPE within the locker and staging areas are both integral and essential to the job. The PPE is not "merely a convenience to the employee." *Id.* The

---

FLSA coverage precisely because such activities are themselves "principal activities." *IBP, Inc. v. Alvarez*, 546 U.S. at 33.

19

Plaintiffs' work cannot be done without PPE – indeed it would be illegal to work without it. And Butterball requires Plaintiffs to wear PPE to do their job or they will be sent off the production floor and possibly fired. These items of PPE are not items that Plaintiffs would wear at home to go about their private activities – these are items one wears in a turkey processing plant to effectively do ones job. The government and Butterball require it.

Some courts also break out a related factor, asking whether an activity is done for the benefit of the employer. *Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499, 517 (D.Md. 2009) citing *Alvarez v. IBP, Inc.*, 399 F.3d 894, 902-03 (9th Cir. 2003). *See, e.g., Hosler v. Smithfield Packing Co.*, Case No. 7:07-CV-166-H, Doc. 426 (E.D.N.C. M&R filed August 31, 2010); *Parker v. Smithfield Packing Co.*, Case No. 7:07-CV-176-H, Doc. 281 (E.D.N.C. M&R filed August 31, 2010); *Anderson v. Perdue Farms, Inc.*, 604 F.Supp.2d 1339, 1354-56 (M.D.Ala. 2009)(11th Circuit test is "(1) whether the activity is required by the employer, (2) whether the activity is necessary for the employee to perform his or her duties, and (3) whether the activity primarily benefits the employer.") Integral and indispensable would appear to subsume and incorporate "for the benefit of the employer." If something is integral and indispensable to the employer's job, then it is hard to imagine how doing it would not be for the benefit of the employer.

Under these factors, Plaintiffs' donning of PPE is integral and indispensible. The activity is clearly necessary to the work – indeed, it is mandatory and the work cannot be done without it. It is also done for the benefit of the employer – the government will not allow Butterball to operate without requiring employees to wear PPE. Thus, without enforcing this requirement, Butterball would not be in business. Clearly PPE benefits Butterball under any of tests of integral and

20

indispensable.

### 1. Butterball Requires Workers to Wear PPE to Perform Their Job Duties

Activities that workers must perform in order to perform their job duties are compensable principal work activities. 29 C.F.R. § 790.8(a). As the Supreme Court held in *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 599 (1944):

> The extraction of ore from these mines by its very nature necessitates dangerous travel in petitioners' underground shafts in order to reach the working faces, where production actually occurs. Such hazardous travel is thus essential to petitioners' production. It matters not that such travel is, in a strict sense, a non-productive benefit. Nothing in the statute or in reason demands that every moment of an employee's time devoted to the service of his employer shall be directly productive. Section 3(j) of the Act expressly provides that it is sufficient if an employee is engaged in a process or occupation necessary to production. Hence employees engaged in such necessary but not directly productive activities as watching and guarding a building, waiting for work, and standing by on call have been held to be engaged in work necessary to production and entitled to the benefits of the Act. Iron ore miners travelling underground are no less engaged in a 'process or occupation' necessary to actual production.

*Id.*

Donning and doffing of PPE is both integral and indispensable to a principal work activity when it is required by the employer's policy or to keep the employer's product clean. See, *Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499, 517 (D.Md. 2009) *Hoyt v. Ellsworth Cooperative Creamery*, 07-CV-386-JCS, 2008 WL 3828583, 3 (W.D.Wisc. 2008) (hairnets and hardhats required by employer because of customers' demands and compliance with state law); Wage and Hour Division Opinion Letter, U.S. DOL, 2001 WL 58864 (Jan 15, 2001) ("An employer must compensate its employees for any activity that is an integral and indispensable part of the employee's principal activities, including the putting on, taking off and cleaning of personal protective equipment, clothing or gear that is required by law, by rules of the employer or by the

21

nature of the work."); Ex. 75, Wage and Hour Advisory Memorandum No. 2006-2 (May 31, 2006) ("like donning, obtaining the gear (as opposed to waiting to obtain the gear) 'is always essential if the worker is to do his job,' the compensable day starts once the employee has obtained the gear required to be stored on the premises by taking items out of a bin, a locker or another designated storage area."). Here, Butterball's employment policies require workers to wear PPE. These policies are to prevent food contamination, Butterball's exposure to workmen's compensation claims, increase production efficiency, and compliance with federal regulations. Butterball prohibits workers from performing his or her duties on the production floor when they who do not have their PPE on. For example, Butterball quality assurance employees monitor the door to the production floor and prohibit workers from entering the production area if they do not have their required PPE on. And the consequences of failing to comply with Butterball's PPE requirement can result in termination.

Even if the employer does not per se require the PPE, the PPE may still necessary for the employee to perform his or her job. *See*, *Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499, 517 (D.Md. 2009). For example, Butterball provides workers with cotton gloves, duct tape, and paper towels to perform their job duties. *See* Ex. 25, Videotape of Live Hang Department. Workers are provided with cotton gloves to insulate their hands from the cold temperature. Otherwise their hands will stiffen up and they will slow down production. Live hang workers wear cotton gloves to prevent callusing on their hands and injuries from the claws of live birds. Ex. 36, Dejesus Dep., pp. 36:9-38:19. Some workers wrap their hands and sleeves with duct tape. This is to prevent hand injuries from hanging live thrashing birds. It is also to prevent rashes from feces,

dust, and feathers from sliding down their sleeves or coming in contact with their skin. Ex. 36, Dejesus Dep., pp. 36:9-38:19.

## 2. Workers Wear PPE for Butterball's Benefit

Additional proof that the PPE is integral and indispensible is established because Butterball requires workers to wear the protective gear for Butterball's benefit. Federal regulations require Butterball to implement and enforce the use of PPE to prevent food contamination. PPE secondarily prevents workers from injuries, but this also reduces Butterball's liability and increases production efficiency. Further, compliance with federal regulations is necessary to avoid civil and criminal liability and injunctive measures against the company. And finally, Butterball benefits from workers wearing bump caps because markings on the caps are used to identify different positions from a distance within the sprawling plant.

Butterball requires its workers to wear PPE in order to comply with its obligations under the law. Failure to comply with FDA, USDA, and OSHA standards exposes Butterball to civil and criminal liability and injunctive relief. 21 U.S.C. § 461 (FDA civil penalties for adulterated products); 29 U.S.C. § 662 (OSHA injunctive relief); 29 U.SC. § 666 (OSHA civil and criminal penalties). Failure to comply with sanitary standards may force government regulators to slow down or stop production. 9 C.F.R. § 500.2. Thus, Butterball profits and benefits from complying with the law.

Prevention of bacterial outbreaks and contamination is one of Butterball's primary goals, as its obligation to customers is not just to provide turkey products, but to provide safe and healthy turkey products. The consequence of failing to provide uncontaminated turkey products and sanitary

23

working conditions is dire. For example, turkey products containing Listeriosis can potentially kill consumers. *Drayton v. Pilgrim's Pride Corp.*, 472 F.Supp.2d 638 (E.D.Pa. 2006). Thus, federal regulations require Butterball to take measures to prevent bacterial outbreaks and contamination. *See*, 9 C.F.R. § 430.4 (Control of Listeria monocytogenes in post-lethality exposed ready-to-eat products). Further, recalling contaminated turkey products and litigation can costs hundreds of millions of dollar. *See, Drayton v. Pilgrim's Pride Corp.*, 472 F.Supp.2d 638 (E.D.Pa. 2006) (Pilgrim's Pride required to recall 27.4 million pounds of turkey products because of Listeriosis outbreak).

Both FDA and USDA regulations require poultry processing plants to establish food safety standards to prevent food contamination. 21 C.F.R. § 110.10 (FDA); 9 C.F.R. § 416.12 (USDA); 9 C.F.R. § 416.5 (Employee hygiene). The FDA and USDA standards are designed to protect consumers from contaminated products. If the products are adulterated or the conditions are unsanitary, then the USDA could retain products, stop or slow down a line, or refuse to allow the processing of a product. 9 C.F.R. § 500.2. These enforcement actions reduce production and thus negatively impact profits. Here, Butterball has implemented Good Manufacturing Practices (GMPs) that requires workers to wear PPE in compliance with FDA and USDA regulations. Thus, Butterball's GMPs prevent the production of adulterated products and an unsanitary production facility. *Perez*, 610 F.Supp.2d at 518; *Franklin v. Kellogg Co.*, ---F.3d ----, 2010 WL 3396843, *12 (6th Cir. 2010) (donning and doffing uniforms and equipment primarily benefits Kellogg because the uniform and equipment ensures sanitary working conditions and untainted products)

Each piece of PPE that workers wear prevents food contamination. *See, Helmert v. Butterball,*

24

*LLC,* No. 4:08CV00342 JLH, 2009 WL 5066759 (E.D.Ark. Dec. 15, 2009) ("Much of the donning and doffing at Butterball's turkey processing plants in Ozark and Huntsville is essential to Butterball's ability to provide uncontaminated food products"). Without PPE, Butterball risks contaminating its turkey products from foreign unsanitary substances such as hair, open wounds, contact with outside substances such as clothing, bathroom and street filth and other substances. 21 C.F.R. § 110.10 (FDA); 9 C.F.R. § 416.12 (USDA). Butterball's GMPs require workers to wear hairnets, beard nets, smocks, aprons, gloves, earplugs, safety glasses, plastic sleeves, hard hats, and approved footwear. BB 00392 (hardhat); BB 00394 (footwear). Workers that use sharp objects, such as a knives, must wear Kevlar gloves, steel mesh gloves, and arm guards to prevent cuts to themselves and to avoid exposing their turkey products to workers' blood.

Butterball also requires workers to wear PPE in order to comply with OSHA regulations. Compliance with OSHA is also for Butterball's benefit. In passing OSHA, Congress stated "personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." 29 USC § 653. While Butterball will likely argue that PPE protects employees, it undoubtedly primarily benefits Butterball by enabling it to operate in its regulatory environment. *Steiner, supra.* "Though it is perhaps the case that the frocks provide a benefit to the plaintiffs, that does not alter the fact that the reason the defendants require their employees to wear frocks is motivated not by the employees' needs, but rather by the defendants' need to maintain a sanitary production floor." *Jordan v. IBP, Inc.,* 542 F.Supp.2d 790, 807, (M.D.Tenn. 2008) It further benefits Butterball by reducing various costs such as workers

compensation for work related injuries, it reduces turnover and the need to recruit and train new employees, and increases production. [need cites] By reducing injuries, Butterball is more profitable. New and injured employees reduce Butterball's production efficiency. Less efficiency results in less sales and less profits for the company. Thus, it is in Butterball's best interest to protect job related injuries to its employees.

Butterball also requires its workers to wear bump caps so that Butterball can identify different types of workers at a distance. Bump caps come in different colors and have different markings on them. These marking and colors identify whether a workers is a Team Leader, Supervisor, or a New Associate. BB 00393. Thus, Butterball is able to easily identify which employee to contact in a busy crowded plant in case the person or position is needed. Different colored ribbons are also used on smocks in the Ready to Eat portion of the plant for the same identification purposes. Ex. 76, Lerch Dep., pp. 47:10-48:13.

Donning and doffing protective gear is done "necessarily and primarily" for the employer's benefit in the context of meat processing. *Alvarez v. IBP,* 339 F.3d at 903. ("It is beyond cavil that the donning, doffing, washing, and retrieving of protective gear is, at both broad and basic levels, done for the benefit of IBP.") The Court followed the same reasoning in *Ballaris v. Wacker Siltronic Corp.,* 370 F.3d 901 (9th Cir. 2004), holding that donning and doffing uniforms at a silicon chip manufacturing plant was done primarily for the benefit of the employer because the uniforms "were required to limit potential cleanroom contamination, and thereby to assist the employer is ensuring the quality of the silicon chips manufactured at the plant." *Ballaris,* 370 F.3d at 911. *See also Perez v. Mountaire Farms, Inc.* 601 F.Supp.2d 670, 680 (D.Md.2009); *Jordan et*

26

*al. v. IBP, Inc.,* 542 F.Supp.2d 790, 807 (M.D.Tenn.2008). In *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. at 599, the Supreme Court found that an employer primarily benefitted from the unproductive time workers spent traveling down mine shafts in order to be able to do the employer's work. In *Steiner, supra,* the Supreme Court found that changing clothes and showering at the plant were compensable principal work activities that primarily benefited the employer, when state law required the employer to require these activities. 350 U.S. at 248 and 251. Here, federal law requires the donning and doffing of PPE for Butterball to be able to operate. Plaintiffs' donning and doffing of PPE accordingly benefits Butterball and requires that these activities be considered a principal work activity.

**3. The Fact That Some Workers Put On Boots or Bumpcaps Before Arriving Does Not Mean that Other Workers Donning PPE At The Plant Are Not Engaged In A Principal Work Activity.**

 Most Butterball production workers put on and take off their PPE in the locker rooms Butterball provides for that use at the start and end of their shifts and during each break. At the beginning and end of each shift workers must put on their smocks in the area just outside of the production floor. And workers on the RTE side are required to put on and take their rubber boots at the plant at the start and end of their shifts and during breaks. During breaks workers must remove their smocks, boots on RTE, vinyl and rubber gloves, aprons, and cut resistant gloves, in order to go outside, use the restroom, enter the cafeteria, or go to their locker.

 Even if a few workers take some PPE home (Butterball is not paying anyway), that does not exclude the donning of PPE in the company provided locker rooms from being integral and indispensable to a principal work activity, under the Supreme Court's tests in *Steiner* and

27

*Alvarez.* See *Anderson v. Perdue Farms, Inc.*, 604 F.Supp.2d 1339, 1354-56 (M.D.Ala. 2009)(rejecting view of DOL expressed in May 31, 2006 Wage and Hour Advisory Memorandum No. 2006-2, and citing cases) The PPE is still 1) integral to the work, and 2) indispensable to the work. And the activity benefits Butterball. *Steiner, supra,* and *Alvarez, supra* Furthermore, donning of PPE after the first principal work activity is compensable under the continuous workday rule. 29 C.F.R. § 790.6(b). Butterball assigns workers a locker to store their PPE and thus, does not expect or require workers to don and doff their PPE at home. *Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499, 519 (D.Md. 2009) ("If changing at home were a bona fide option, there would be no real need for employee lockers or for Defendants to incur the costs of installing them").

    Butterball may argue that the May 31, 2006 Wage and Hour Advisory Memorandum No. 2006-2 in which the then acting Administrator of the Wage and Hour Division advises Wage and Hour staff of his personal view that "donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises." Butterball will likely argue that this Advisory Memorandum insulates employers from having to compensate workers for donning and doffing on premises, if it merely permits some employees to don or doff the PPE at home. This Memorandum is not a document entitled to deference by this Court and it utterly fails to persuade since it conflicts with the tests for principal work activities set forth in *Steiner* and *Alvarez.*[3] Indeed, in A*lvarez,* the

---

[3] This memorandum is not a regulation, or an official interpretation of the FLSA by DOL and it is not entitled to deference because it clearly conflicts with the tests for principal work activities set forth in *Steiner* and *Alvarez.* Nor is the memo entitle to deference under *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)). *Auer* stands only for the principle that

Supreme Court reiterated that "under *Steiner*, activities, such as the donning and doffing of specialized protective gear, that are 'performed either before or after the regular work shift, **on or off the production line**, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)'." *Alvarez.*, 546 U.S. at 21. Furthermore, even though the workers in *Alvarez* did not universally don their PPE in the locker room,[4] the Court held that the donning of PPE in the locker room triggered the continuous work day. "Accepting the necessary import of our holding in *Steiner*, we conclude that the locker rooms where the special safety gear is donned and doffed are the relevant "place of performance" of the principal activity that the employee was employed to perform within the meaning of § 4(a)(1)." *Alvarez*, 546 U.S. at 34. The Court did not in any way say that the employer must strictly require employees to don or doff in the locker room to make it the "relevant place of performance." Nor did the Court hold that if some donned elsewhere, that would permit the employer to avoid starting the continuous work day, even for those workers who used the company provided locker room for its intended purpose.

What *Alvarez* does suggest, is the commonsense notion that workers who don or doff PPE at

_____

Courts defer to an agency's interpretation of its own ambiguous regulation. Here, the memo purports to interpret the Supreme Court *Alvarez* decision and it plainly applies criteria that were nowhere mentioned in that decision and which conflict with the principals set forth therein.

[4] "All production workers in both divisions must wear outer garments, hardhats, hairnets, earplugs, gloves, sleeves, aprons, leggings, and boots. Many of them, particularly those who use knives, must also wear a variety of protective equipment for their hands, **522 arms, torsos, and legs; this gear includes chain link metal aprons, vests, plexiglass armguards, and special gloves. **IBP requires its employees to store their equipment and tools in company locker rooms, where most of them don their protective gear**." *Alvarez*, 546 U.S. at 30 (emph. added).

29

home, do not thereby extend the start or end of their continuous work day all the way to their homes. Such a rule would permit workers to unfairly evade the Portal to Portal Act's prohibition on claiming as work routine travel to and from work from home, just by putting on or taking off an article at home.[5]  Plaintiffs in this case do not claim that they must be paid for any isolated events of donning of PPE at home or travel to work from home. However, the fact that a Plaintiff, might in some instances put on an article of PPE at home, does not make the integral and indispensable tasks of donning and doffing PPE on the defendant's premises non-compensable. *Alvarez, supra.*

### 4. Butterball Must Pay For All Time Spent Donning PPE From The First Principal Work Activity, Notwithstanding Whether the PPE Is Deemed Unique or Non-Unique.

Butterball contends that donning or doffing of "non-unique" equipment is not compensable. Butterball labels boots, hair nets, ear plugs, smock, gloves, bump caps, safety glasses as non-unique gear. Butterball 30(b)(6) Dep. Lenaghan, Gary January 14, 2010, p. 143:11-12. Butterball's believes that putting on and taking off this required PPE is effortless and therefore non-compensable. However, this argument flies in the face of the continuous workday rule. And

---

[5]The Portal to Portal Act, 29 U.S.C. § 254(a) states,

(a) Activities not compensable

Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, … on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee …

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or

30

Butterball's argument is contrary to DOL regulations, and has been repeatedly rejected by this court and courts throughout the country.

Under the continuous workday rule, there is no distinction between unique and non-unique PPE. In a case against Butterball's minority owner, this Court has refused to accept the same position Butterball advances here. In a meat packing case this Court held that if donning and doffing "non-unique" PPE is integral and indispensable to plaintiffs' work then it is compensable under the continuous workday rule. *Hosler v. Smithfield Packing Co., Inc.*, 7:07-CV-166-H, Doc. 442, p. 4 (E.D.N.C. Sept. 27, 2010) . The U.S. DOL does not draw a line between unique and non-unique gear. The U.S. DOL has explicitly stated that "whether required gear is "unique" or "non-unique" is irrelevant to whether donning and doffing is a principal activity." Ex. 75, Wage and Hour Advisory Memorandum No. 2006-2 (May 31, 2006).

Similarly, Courts throughout the country have rejected this unique/non-unique distinction. The poultry industry, and virtually all of Butterball's competitors, are required to pay workers under the continuous workday rule. And courts have repeatedly rejected the poultry industry's attempts to escape payment for putting on and taking off PPE. *See*, *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3d Cir. 2007) (After trial court granted found in favor of workers at a chicken processing plant that they perform work under the FLSA when they don and doff PPE, including as safety glasses, earplugs, boots, smocks, and hairnets); *Jordan v. IBP, Inc.*, 542 F.Supp.2d 790, 809 (MD.Tenn. 2008) (Granting employees summary judgment motion that workers at a beef and pork processing plant perform compensable work when they don and doff frocks); *Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240, 1247 (D.Kan.2007) (Court rejected

---

activities

31

beef processor's summary judgment arguments that donning and doffing "standard protective equipment" is not work); *Lopez v. Tyson Foods*, No. 8:06CV459, 2007 WL 1291101, at 3-4 (D.Neb. March 20, 2007) (Granting employees summary judgment motion denying beef processor's motion for summary judgment that donning and doffing non-unique gear is not compensable); *Fox v. Tyson Foods, Inc.*, No. 99CV01612, 2002 WL 32987224, at *10 (N.D.Ala. Feb. 4, 2002) (on summary judgment court found that donning and doffing of sanitary and PPE is "work" under the FLSA); *Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860, 864 (W.D.Wis.2007) (employees in meat processing performed integral and indispensable activities when they donned and doffed PPE because in part workers were subject to discipline if they failed to don equipment); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692-692 (1946) (Workers who donned aprons and overalls, removed shirts, taped or greased arms, putt on finger cots, prepared the equipment for productive work, turned on switches for lights and machinery, opened windows and assembled and sharpening tools did so for employer's benefit); *Mitchell v. King Packing Co.*, 350 U.S. 260 (1956)(pre and post shift knife sharpening activities are an integral part of and indispensable to the various butchering activities); *Johnson v. Koch Foods, Inc.*, 670 F.Supp.2d 657, 669 (E.D.Tenn. 2009) (Court denied chicken processor summary judgment as to whether donning and doffing PPE was integral and indispensible). Similarly courts reject non-meat or poultry processing plant employers arguments that donning and doffing PPE is not compensable. *Lee v. Am-Pro Protective Agency, Inc.*, 860 F.Supp. 325 (E.D.Va. 1994) (court denied the security guard company summary judgment because it found evidence that the employees' uniforms benefited the employer and that the uniforms were necessary to the

32

employees' performance of the guards' principal activity); *see also McDonald v. Kellogg Co.*, ---F.Supp.2d ---, 2010 WL 3724649, * 16 (D.Kan. Sept. 16, 2010)(donning and doffing uniforms, hair nets, beard guards, ear plugs and safety glasses are for the bakery's benefit because they ensure that the employer is able to produce and sell uncontaminated food products) vac'd on grounds that the parties agreed not to address this issue, 2010 WL 4386899 (D.Kan. Oct. 29, 2010).

Further, Butterball and Butterball's minority owner – Smithfield -- have, had this distinction rejected in both the Eastern District of Arkansas and Eastern District of North Carolina. *Parker v. Smithfield*, 7:07-cv-00176-BO, Doc. 234 (E.D.N.C. Jan. 15, 2010); *Lewis v. Smithfield Packing Company, Inc*, 7:07-CV-166-H, Doc. 442 (E.D.N.C. Sept. 27, 2010); *Helmert v. Butterball, LLC*, No. 4:08CV00342 JLH, 2009 WL 5066759, *11 (E.D.Ark. Dec. 15, 2009). Butterball is estopped from arguing that donning of "non-unique" PPE is not a principal work activity. *See, Clark v. Wells Fargo Financial, Inc.*, 2008 WL 4787444, 3 (M.D.N.C. Oct. 30 2008).

## D. Butterball's *De Minimis* Defense Pre-January 2005 Is Without Merit.

Plaintiffs are entitled to summary judgment on Butterball's *de minimis* defense for all production employees working prior to January 2006 and for production workers who were terminated between January 1 and June 21, 2006. Before June 21, 2006, Butterball only paid workers for the time the production line was scheduled to run; it did not pay workers for any continuous workday rule (CWDR) time spent between the first principal work activity and the last principal work activity. It did not recognize any obligation to pay for donning or doffing time or any other pre- or post- shift work. On June 21, 2006, Butterball paid production employees

33

who were still employed retroactive "plug time" of six minutes per day to partially compensate them for unpaid work under *IBP v. Alvarez* and it did so retroactively for those employees still employed, going back to January 1, 2006.[6]

Plaintiffs expect to demonstrate the amount of uncompensated time through Butterball's punch detail history (Kronos time clock records) and Plaintiffs testimony. Butterball's expert, Jeffrey Fernandez, measured how long it took workers to perform discrete donning and doffing activities and Butterball will argue that these observations constitute the amount of uncompensated work its production employees worked. And although Plaintiffs testimony will show that the uncompensated work significantly exceeds that found by Fernandez, the precise amount of work is a disputed issue of fact.

Butterball has raised a *de minimis* defense, claiming that the amount it shorted workers under

---

[6] Butterball did not pay any of the employees "liquidated damages" under the FLSA or NCWHA for the late payment of the plug time. Whenever payments due under the FLSA are not made on the regular pay date they must be paid, liquidated damages are mandatory. The law does not leave the determination as to when overtime or minimum wages must be paid to the employer. *See, e.g., Calderon v. Witvoet*, 999 F.2d 1101, 1107 (7th Cir.1993) (the FLSA requires an employer to pay "on time"); *U.S. v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 491 (2d Cir.1960) (an employer is not relieved of liability for FLSA violations by making late payment after the original payment becomes due); *see also Atlantic Co. v. Broughton*, 146 F.2d 480, 482 (5th Cir.1944) (failure to pay the full amount of minimum wages and overtime on "any regular payment date" immediately creates the obligation to pay the difference between the wages paid and the wages due, plus an equal "amount as liquidated damages...."); *Rogers v. City of Troy, N.Y.*, 148 F.3d 52, 61 (2d Cir. 1998); *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 135-36 (3d Cir. 1999)(if employers could determine when to make FLSA payment employees remedies under the act would be vitiated).; 29 C.F.R. § 778.106 (overtime).

Similarly, the NCWHA requires that "Every employer shall pay every employee all wages and tips accruing to the employee on the regular payday. NCWHA § 95-25.6. Liquidated damages are due under the NCWHA for wages withheld beyond the regular payday. NCWHA § 95-25.22(a1).

the FLSA is too small to bother recording or paying. However, even taking Butterball's measurements as valid (and Plaintiffs expect to prove at trial that the uncompensated time is significantly greater than that calculated by the Defendant) the time it took workers to perform unpaid compensable activities pre and post shift was far from *de minimis* and Butterball's *de minimis* defense must fail. The defense fails a matter of law because the amount of uncompensated time for the pre and post shift compensable activities is, according to Butterball's expert, measurable, substantial, and regular.

Under the *de minimis* doctrine, courts "treat theoretically compensable work as noncompensable under the FLSA when the amount of such work is negligible." *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir.2001) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)). Therefore, "when [ ] a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or the Fair Labor Standards Act." *Aiken v. City of Memphis*, 190 F.3d 753, 758 (6th Cir.1999) (quoting *Mt. Clemens Pottery*, 328 U.S. at 692).

There is no bright-line rule for when an amount of work constitutes "split-second absurdity" for which an employer is relieved of its duty to pay. Factors that are analyzed include: (1) the practical administrative difficulty of recording the additional time, (2) the aggregate amount of compensable time, and (3) the regularity of the additional work. *Lindow v. U.S.*, 738 F.2d 1057, 1063 (9th Cir.1984). At this point there can be no claim of administrative difficulty in recording the additional time, since at a minimum, Butterball's expert has already done this work.[7]

---

[7] Any claim of administrative difficulty would ring hollow. Apart from the time study it performed to defend this litigation, here, Butterball has already admitted that there is no inherent

35

The Department of Labor has issued an interpretive regulation concerning the *de minimis* defense:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are *de minimis.* (*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him. *See Glenn L. Martin Nebraska Co. v. Culkin*, 197 F. 2d 981, 987 (C.A. 8, 1952), cert. denied, 344 U.S. 866 (1952), *rehearing denied*, 344 U.S. 888 (1952), holding that working time amounting to $1 of additional compensation a week is "not a trivial matter to a workingman," and was not *de minimis*; *Addison v. Huron Stevedoring Corp.*, 204 F. 2d 88, 95 (C.A. 2, 1953), *cert. denied* 346 U.S. 877, holding that "To disregard workweeks for which less than a dollar is due will produce capricious and unfair results." *Hawkins v. E. I. du Pont de Nemours & Co.*, 12 W.H. Cases 448, 27 Labor Cases, para. 69,094 (E.D. Va., 1955), holding that 10 minutes a day is not *de minimis*.

29 CFR § 785.47. Here, Butterball cannot claim refuge in the *de minimis* defense because the amount of time for which defendant seeks to evade payment is not insubstantial and the time can be precisely recorded.

### 1. Taking Butterball's Expert's Testimony As Correct, Butterball Recorded The Uncompensated Time

Butterball cannot present evidence that the amount of time for which Plaintiff seeks compensation is too small to be recorded for payroll purposes. See, *Perez v. Mountaire Farms,*

---

difficulty in placing time clocks in a position to measure the first principal work activity and the last. Wells, Dec. 15, 2009 Dep p.18:22-19:17, p. 30:8-31:9. Butterball's expert Fernandez also confirmed that placing time clocks in proper position to measure first and last PWAs can be done. Butterball Expert Dep., pp. 127:9-129:3, p. 131:11-131:21. And Butterball itself performed time studies prior to granting 6 minutes per day of plug time to its active employees in June 2006 retroactive to January 1, 2006. Ex. 49

*Inc.*, 610 F.Supp.2d 499, (D.Md. 2009)(court relied on experts for the amount of uncompensated time thus there was no administrative difficulty); *Lindow* at 1063 (stating that employers "must compensate employees for even small amounts of time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes"); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 954 (W.D.Wis.2008) (rejecting employer's request for summary judgment on *de minimis* defense and holding, as a matter of law, that donning time was not *de minimis* where employer conceded that it would not be administratively difficult to record donning time); *Saunders v. John Morrell & Co.,* No. C88-4143, 1992 WL 531674, *2 (N.D.Iowa Oct. 14, 1992)[8] ("The Court is not persuaded that Morrell cannot calculate the amount of time its employees spend cleaning safety equipment in this day of technology"); *see also* 29 C.F.R. § 785.47 ("An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable time he is regularly required to spend on duties assigned to him".).

Here, taking the facts most favorable to Butterball, and for purposes of this motion, not contesting that Butterball's expert took inaccurately and improperly stringent measures of the uncompensated under the continuous workday rule,[9] Butterball's expert measured the amount of time it took workers to perform each donning and doffing activity, walk to various locations, and wait in line. See Ex. 5, Fernandez Report, p. 49-61. Butterball's payroll department would not have an administrative difficulty making these back payments. Indeed, in June 2006, Butterball

---

[8] John Morrell & Company is a Smithfield Company. Ex 77, <http://www.smithfieldfoods.com/our_company/view.aspx>. (last accessed November 18, 2010)
[9] *See,* Plaintiffs' Motion In Limine To Preclude The Expert Report and Testimony of Dr. Fernandez.

paid current employees six minutes back pay for each shift they worked from January through

May 2006 to compensate for unpaid donning and doffing. Thus, presently Butterball would not

have difficultly paying workers for this uncompensated time under the Fernandez formula.

## 2. According to Butterball's Expert, The Amount of Unpaid Compensable Time Is Substantial

Even according to Butterball's expert, Plaintiffs' aggregate claims are substantial. For the

time period prior to January 2006, Butterball's expert calculated that workers spend 8.602 to

25.013 minutes (depending on the department in which they worked) performing discrete

donning, doffing, walking, and sanitizing activities at the beginning and end of each shift.[10]

Fernandez Report, p. 49-61. On a weekly basis this ranged from approximately $10.64 to $23.14

of underpayments. Dunn Dec. ¶ 80. Collectively, Butterball failed to pay workers approximately

$695,960.57 from May 11, 2005[11] to December 31, 2005, which amounts to a substantial sum for

these low wage workers.[12] Dunn Dec. ¶ 81; *See Landaas v. Canister Co.*, 188 F.2d 768, 771 (3d

Cir.1951) (finding that employees' claims for $21.67 to $256.88 over a period of three years was

not *de minimis*); *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (2d Cir. 1953)

(underpaying workers one dollar per week is not *de minimis*); *Lindow*, 738 F.2d at 1063 (noting

that courts "have applied the *de minimis* rule in relation to the total sum or claim involved in the

litigation"); *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333 (10th Cir. 1998) (8.5 minutes was not *de*

---

[10] Because the parties dispute the amount of time Plaintiffs don and doff PPE, sanitizing, and walking, Plaintiffs only seek summary judgment based on Butterball's own conservative calculations of the time worked. Plaintiffs reserve the factual dispute for trial.

[11] This is two years prior to filing the class action complaint.

[12] Plaintiffs' claims are still substantial if the court finds that donning and doffing only unique PPE is compensable. For example, workers are shorted $4.51 to $15.03 per five day work week, and collectively they were underpaid by approximately $348,013.74 from approximately May 11,

38

*minimis* for meat processing plant employees. "[T]he aggregate for an individual, if looked at over the period of two to three years, was significant. It is also appropriate to consider an aggregate based on the total number of workers.") (citations omitted); DOL's Wage and Hour Advisory Memorandum No.2006-2, dated May 31, 2006 (the aggregate time must be looked at to determine if *de minimis* defense applies); *Perez v. Mountaire Farms, Inc.*, 610 F.Supp.2d 499 (D.Md. 2009) (class aggregate claims were substantial); *Saunders v. John Morrell & Co.,* No. C88-4143, 1992 WL 531674, *2 (N.D.Iowa Oct. 14, 1992). Workers' claims are even greater when liquidated damages are added. Thus, there is no dispute that the aggregate value of Plaintiffs' claims is substantial.

 Courts have denied numerous employers' *de minimis* defense for time less than that sought here. Butterball's position in this litigation is that any uncompensated work less than 10 minutes is *de minimis*. Doc. 455, p. 10, ¶ 32. However, courts throughout the country have rejected that position. *See*, *Collins v. Sanderson Farms, Inc.*, 568 F. Supp.2d 714, 724 (E.D. La. 2008) ("The Court is highly doubtful that four to eight minutes donning and doffing …each workday, could appropriately be considered "*de minimis*" without an additional showing that there is a significant administrative burden on the employer to count such time"); *Kasten*, 556 F. Supp. 2d at 954 ("even accepting defendant's estimate of 4.117 minutes to 4.755 minutes spent donning, doffing and walking, the amount of time does not fall under the *de minimis* exception"); *Spoerle*, 527 F. Supp. 2d at 868 (recognizing the arbitrariness of designating 10 minutes as the *de minimis* threshold and stating that "even if the total time at issue is only a few minutes, this would not necessarily mean that the time was not compensable"); *Thrower v. Peach County, Georgia, Bd.*

---

2005 until December 31, 2005. Dunn Dec. ¶ 81.

39

*Of Educ.*, 5:08-CV-176 (MTT), 2010 WL 4536997 (M.D.Ga. Nov. 2, 2010) (rejecting employers summary judgment argument that 10 a day is *de minimis*); *Lindow*, 738 F.2d at 1062; see also *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir.1994) ("[P]revious decisions indicate that as little as ten minutes of working time goes beyond the level of *de minimis* and triggers the FLSA."). Thus, even under Dr. Fernandez's inaccurate calculations[13], Plaintiffs' claims are not *de minimis*.

### 3. Butterball Requires Uncompensated Work On A Daily Basis

Butterball mandated uncompensated donning and doffing PPE, walking, and sanitizing during each worker's shift up through June 21, 2006. See, infra – donning and doffing PPE section. For workers within the limitation period who were not paid plug time, the amounts due (even under the minimal calculation of Jeffrey Fernandez) are clearly not *de minimis*.

## IV.    CONCLUSION

For the reasons set forth above, the Plaintiffs' Motion for Partial Summary Judgment should be granted in its entirety.

This the 19th day of November 2010.


/s/ Robert J. Willis                      Dan Getman
Law Office of Robert J. Willis            Matthew Dunn
P.O. Box 1269                             GETMAN & SWEENEY, PLLC
Raleigh, NC 27602                         9 Paradies Lane
Tel: (919)821-9031                        New Paltz, NY 12561
Fax: (919)821-1763                        Tel: (845) 255-9370
Email: rwillis@rjwillis-law.com           Fax: (845) 255-8649
NC Bar No.: 10730                         Email: dgetman@getmansweeney.com
                                          Email: mdunn@getmansweeney.com

---

[13] See, Plaintiffs' Motion *In Limine* to Strike Report and Testimony of Jeffrey Fernandez.

40

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2010 I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following: Melissa R. Davis, L. Dale Owens, Stephen X. Munger, Robert Capobianco, Eric

Magnus, Todd Van Dyke, and Joel T. Alexander.

This the 19th day of November 2010.

<div style="margin-left: 40%;">

/s/Robert J. Willis
Attorney for Plaintiffs
P.O. Box 1269
Raleigh, NC 27602
Telephone: (919)821-9031
Fax: (919)821-1763
E-mail: rwillis@rjwillis-law.com
NC Bar No: 10730

</div>

41